UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

BOBBY D. HIGGINBOTHAM                    CIVIL ACTION NO. 3:13-cv-2561
    LA. DOC #569228

                                   SECTION P

VS.

                                   JUDGE ROBERT G. JAMES

STATE OF LOUISIANA                       MAGISTRATE JUDGE HAYES

## REPORT AND RECOMMENDATION

*Pro se* Petitioner Bobby D. Higginbotham filed the instant Petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 on August 26, 2013. [doc. # 1]. Petitioner attacks his 2010 convictions for malfeasance in office and felony theft, as well as the sentences imposed by the Sixth Judicial District Court, Tensas Parish. This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of the Court. For reasons assigned below, it is recommended that the Petition, [doc. # 1], be **DENIED**.

## Background

The procedural history in this case has been set forth by the Louisiana Second Circuit Court of Appeal as follows:

> In January of 2007, Bobby Higginbotham took office as Mayor of the Town of Waterproof (the "Town"), Louisiana, a Lawrason Act municipality, located in Tensas Parish. In February of 2009, a Tensas Parish grand jury issued a 44–count indictment charging Higginbotham with 21 counts of felony theft, 18 counts of malfeasance in office, 4 counts of public salary deduction and one count of unauthorized use of a movable.
>
> Immediately before opening statements in the trial of this case, the state amended the grand jury indictment to reduce the charged offenses to only three counts, including,

for the first time, a public contract fraud charge under La. R.S. 14:140. Those counts and their descriptions contained in the written amended bill of indictment included:

1) Public Contract Fraud due to Higginbotham's use of his power or position "by instructing Town of Waterproof employees to purchase goods and services from a business or partnership for the Town of Waterproof of which [Higginbotham] is a member."

2) Malfeasance in Office by the intentional and unauthorized use of the Town's funds for personal travel unrelated to town business.

3) Felony theft "by increasing [Higginbotham's] salary in an amount in excess of $500.00 without the approval and/or knowledge of the Board of Alderman." Higginbotham's salary authorized by ordinance was $12,000, yet he later was paid a salary of $36,000.

\* \* \*

After the removal of Higginbotham's initial counsel in March 2009, due to a conflict of interest, Higginbotham sought numerous continuances of the case relating to his purported unsuccessful efforts to obtain counsel. In early 2010, assessing Higginbotham's actions as delay tactics, the court appointed a public defender as standby counsel for Higginbotham, and the case was set for trial on March 29, 2010.

On March 15, 2010, the recently appointed standby counsel filed a motion for discovery and Higginbotham followed with a similar *pro se* motion on March 17, 2010. Both motions were set for hearing on March 22, 2010. By the date of the hearing, the state had produced the "majority of discovery." On March 26, 2010, Higginbotham filed a motion to continue on the grounds that he had not had time to review the evidence provided by the state.  Hearing on the motion was set for the first day of trial.[1]

\* \* \*

Prior to the beginning of trial on March 29, 2010, the court denied Higginbotham's motion for continuance as not being well grounded and ordered the state to provide Higginbotham with any remaining discovery it had in its

---

[1] Notably, standby counsel informed the court in a sidebar conference at the March 29 hearing of his intent to seek a continuance should he be formally appointed as counsel. Nevertheless, after a hearing to determine Higginbotham's financial status, the court refused to appoint an indigent defender to represent Higginbotham and continued the use of standby counsel.

2

possession. [Footnote omitted]. As evidence contained in the discovery responses was introduced by the state, Higginbotham continued to object on the grounds that he had not been able to review it.

* * *

In April of 2010, during [a] recess of the trial, Higginbotham filed a motion for mistrial based upon the defectively transcribed testimony of two state witnesses which he claimed prejudiced his defense.  During presentation of the testimony of Ted Higginbotham and Dr. Glenda Richardson, the court's recording equipment malfunctioned. Thus, none of Ted Higginbotham's testimony was transcribed and only part of Richardson's testimony was transcribed. On May 7, 2010, by written judgment, the court denied Higginbotham's motion for mistrial.  Higginbotham sought writs to [the Second Circuit Court of Appeal] which, on the morning of May 18, 2010, ordered the granting of a partial mistrial on the public contract fraud case.

* * *

Simultaneously, on the afternoon of May 18, 2010, the trial court called a hearing on various motions including the mistrial. At the hearing, the state also advised the trial court of its agreement to a partial mistrial as to the public contract fraud charge only. The defense objected and requested a mistrial on all counts. The trial court granted the motion in part for the charge of public contract fraud . . . .

Trial resumed on May 19, 2010 . . . .  For the first time during the delayed trial, Higginbotham was represented by counsel and the standby counsel arrangement ended.

* * *

The jury unanimously convicted Higginbotham of the remaining counts.

*State v. Higginbotham*, 122 So. 3d 1, 5-9 (La. App. 2 Cir. 2012).

Thereafter, on February 24, 2011, the trial court sentenced Petitioner to concurrent sentences of five years at hard labor with two years suspended for malfeasance in office and seven years at hard labor with three years suspended for felony theft.  [doc. # 1-3, p. 145].   The trial court ordered Petitioner, upon release from incarceration, to be placed on active supervised probation for a period of five years.  *Id.*

3

On October 17, 2011, counsel for appellant appealed, raising thirteen assignments of error: (1) Petitioner was denied the right to appellate review when the trial court failed to ensure a complete transcript of the proceedings; (2) the trial court erred when it denied Petitioner's motion to quash the jury venire; (3) the State exercised peremptory challenges in a racially discriminatory manner; (4) the trial court erroneously disqualified Petitioner's counsel of choice; (5) Petitioner was denied the right to counsel when the court forced him to represent himself at trial; (6) Petitioner's stand-by counsel had an unwaived conflict of interest; (7) the trial court erred in granting a partial mis-trial; (8) the trial court erroneously admitted inadmissible "other crimes" evidence without proper notice; (9) Petitioner was denied due process, a fair trial, and the right to present a defense when the trial court prohibited him from arguing that his prosecution was politically motivated; (10) Petitioner's right to compulsory process was violated when the court prohibited him from calling Elizabeth Cooper as a witness; (11) the trial court denied Petitioner's motion for mistrial based on substantive amendments to the bill of indictment after the jury was sworn; (12) the trial court refused to give a requested jury instruction on circumstantial evidence; and (13) Petitioner's due process rights were violated when the trial court caused an impermissible breach into jury deliberations.  [doc. # 1-3, p. 108-109].

Proceeding *pro se,* Petitioner raised additional assignments of error: (1) the court erred when it failed to order the District Attorney to provide exculpatory evidence; (2) the court erred when it refused to grant Petitioner's sixth peremptory challenge; (3) the court erred when it granted only a partial mistrial; (4) the court erred when it denied his motion to recuse the District Attorney; (5) the court erred by granting the State's motion in limine; and (6) Petitioner was denied appellate review and due process with regard to deficiently transcribed trial transcripts.

4

*Id.* at 151.

On April 25, 2012, a divided panel of the Second Circuit Court of Appeal, addressing only the issues concerning the partial mistrial, reversed the convictions, vacated the sentences, and remanded for further proceedings.  *Id.* at 100.  However, upon rehearing on June 22, 2012, a divided 5-judge panel of the Court of Appeal vacated the previous opinion and affirmed Petitioner's convictions and sentences.  *Higginbotham*, 122 So. 3d at 34.

On July 23, 2012, Petitioner's retained appellate counsel filed an application for writs in the Louisiana Supreme Court.  [doc. # 1-3, p. 7].  On May 24, 2013, the Supreme Court denied Petitioner's application without comment.  *State v. Higginbotham*, 116 So. 3d 658 (La. 2013).

Petitioner filed the instant Petition on August 26, 2013, raising the same claims raised in his application for writs filed in the Supreme Court on direct review, as detailed below.

The matter is now before the undersigned.[2]

## Law and Analysis

**I.      Standard of Review – 28 U.S.C. § 2254**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996, 28 U.S.C. § 2254, governs *habeas corpus* relief.  The AEDPA limits how a federal court may consider *habeas* claims.

---

[2] Respondent contends that Petitioner is no longer "in custody" and is therefore not entitled to *habeas corpus* relief.  [doc. # 10-1, p. 40].  According to the Louisiana Department of Public Safety and Corrections' Offender Locator System, Petitioner is currently on probation. TELEPHONE CALL TO THE OFFENDER LOCATOR SYSTEM, March 11, 2014.  The federal *habeas corpus* statute provides that *habeas corpus* shall apply "in behalf of a person in custody pursuant to the judgment of a State court."  In that regard, a petitioner is still considered "in custody" if he has not yet been been discharged from his term of parole or probation.  *U.S. v. Tavarez*, 79 Fed. Appx. 79, 80 (5th Cir. 2003); *Caldwell v. Dretke*, 429 F.3d 521, 528 (5th Cir. 2005) (citing *Lee v. Stickman*, 357 F.3d 338, 342 (3d Cir. 2004) (petitioner on probation eligible for *habeas* relief under Section 2254(a)).

After the state courts have "adjudicated the merits" of an inmate's complaints, federal review "is limited to the record that was before the state court[.]"  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).  An inmate must show that the adjudication of the claim in state court:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

A decision is "contrary to" clearly established Federal law "if the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362 (2000)).  "The 'contrary to' requirement refers to holdings, as opposed to the dicta, of . . . [the Supreme Court's] decisions as of the time of the relevant state-court decision."  *Id.* at 740.  Under the "unreasonable application" clause, a federal *habeas* court may grant the writ only if the state court "identifies the correct governing legal principle from . . . [the Supreme Court's] decisions but unreasonably applies the principle to the facts of the prisoner's case."  *Id.* at 741.

Section 2254(d)(2) speaks to factual determinations made by the state courts.  Federal courts presume such determinations to be correct; however, a petitioner can rebut this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

6

## II.  Petitioner's Claims[3]

A. Claim One: The State's Motion for Rehearing

Petitioner claims that the Second Circuit Court of Appeal erred in granting the State's

Motion for Rehearing and that the Louisiana Supreme Court erred in upholding that grant.  [doc.

# 1-2, p. 20].  He argues that the courts erred because the State failed to provide his counsel with

notice of the State's motion, in violation of Uniform Court of Appeal Rule 2-7.2.  *Id.*

Petitioner does not suggest that either state court decision was contrary to, or an

unreasonable application of, clearly established federal law.  Nor does he challenge the

constitutionality of Uniform Court of Appeal Rule 2-7.2.  Petitioner only asks the Court to

reexamine the state courts' determinations of state law.  In that regard, "[i]n conducting habeas

review, a federal court is limited to deciding whether a conviction violated the Constitution,

laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  It is not the

province of a federal court, on *habeas* review, to reexamine state court determinations of state

law.  *Id.*  The U.S. Supreme Court has "repeatedly held that a state court's interpretation of state

law . . . binds a federal court sitting in habeas corpus."  *Bradshaw v. Richey*, 546 U.S. 74, 76

(2005) (citing *Estelle*, 502 U.S. at 67-68); *see also Woodfox v. Cain*, 609 F.3d 774, 816 (5th Cir.

2010) (citation omitted) ("On habeas review we will defer to a state court's interpretation and

---

[3] Petitioner styles all of his claims in the form of Louisiana Supreme Court error.  For instance, instead of alleging that the trial court improperly admitted "404B" evidence, he alleges that "the Louisiana Supreme Court erred when it held that the 404B Evidence was properly admitted."  [doc. # 1-2, p. 52].  When faced with a silent or ambiguous state *habeas* decision, such as the Louisiana Supreme Court's decision here, the federal *habeas* court must "look through" to the last clear state decision on the matter to determine which state court decision to review.  *Jackson v. Johnson*, 194 F.3d 641, 651 (5th Cir. 1999).  In this case, the Second Circuit Court of Appeal issued the last reasoned opinion; thus, that is the opinion to which this Court will apply the AEDPA standards.

application of state law because we search only for violation of federal law.").  Thus, Petitioner's

claim that the Louisiana courts misapplied Uniform Court of Appeal Rule 2-7.2 does not afford

Petitioner a proper basis for federal *habeas* relief and should be **DENIED**.[4]

B. Claim Two: Inadequate Trial Record

     Petitioner claims that the "condition of the [] record in this case violates [his] right to

meaningful appellate review under the Louisiana Constitution and constitutes a fatal defect in the

proceedings warranting the vacatur of his conviction and sentence."  [doc. # 1-2, p. 23-24].  He

claims that the inadequate record "makes it impossible for him to 'conclusively' assign error to"

three of the trial court's errors: (1) erroneous denial of a complete mistrial, (2) erroneous denial

of Petitioner's *Batson* challenge; and (3) failure to grant the required number of peremptory

strikes.  *Id.* at 23-34.

     "The right of an accused in a criminal trial to due process is, in essence, the right to a fair

opportunity to defend against the State's accusations."  *Chambers v. Mississippi*, 410 U.S. 284,

294 (1973).  Where a state has created courts of appeal as "an integral part of the . . . system for

finally adjudicating the guilt or innocence of a defendant," the state's appeal process must

comport with due process.  *Evitts v. Lucey*, 469 U.S. 387, 393 (1985).  However, due process

does not necessarily require that a trial record include a verbatim transcript of all proceedings.

---

     [4] Parenthetically, the Court notes that, contrary to Petitioner's assertions, both of
Petitioner's attorneys were apprised of the State's Application for Rehearing.  On June 1, 2012,
the Clerk of the Louisiana Second Circuit Court of Appeal sent a letter to Petitioner's attorneys,
Daniels and Conner, advising them as follows: "In response to questions that have arisen in
regard to the service of the State's Application for Rehearing filed in this case on May 8, 2012,
the court has instructed our office to tell you that, in the present deliberations on rehearing, the
oppositions filed by the defendant and his counsel are being considered by the court."  [doc. #
10-2, p. 1].

*See generally, Griffin v. Illinois*, 351 U.S. 12, 18-20 (1956); *Draper v. Washington*, 372 U.S. 487, 495 (1963) ("Alternative methods of reporting trial proceedings are permissible if they place before the appellate court an equivalent report of the events at trial from which the appellant's contentions arise.").  Instead, the record need only be "adequate" for purposes of the appeal.  *See Mullen v. Blackburn*, 808 F.2d 1143, 1146 (5ᵗʰ Cir. 1987); *Schwander v. Blackburn*, 750 F.2d 494, 497 (5ᵗʰ Cir. 1985).

To warrant *habeas* relief on a claim that state court transcripts were unconstitutionally inadequate, a petitioner must prove that the missing portion(s) of the transcript actually prejudiced his appeal and must support his claims with more than mere speculation.  *Mullen*, 808 F.2d at 1146; *Thomas v. Cain*, 2013 WL 5960808, at *5 (E.D. La. Nov. 6, 2013); *MacDonald v. Thaler*, 2010 WL 2640135, at *18 (S.D. Tex. June 30, 2010); *Bozeman v. Cain*, 2010 WL 2977393, at *4 (E.D. La. June 7, 2010), adopted, 2010 WL 2977402 (E.D. La. July 20, 2010).

i. Adequacy of the Record With Regard to Erroneous Denial of Complete Mistrial Claim

Petitioner first contends that he could not effectively pursue his "denial of total mistrial" claim on appeal because the trial court failed to properly transcribe two witnesses' testimony pertinent to that claim.  *Id.* at 27.  The Second Circuit Court of Appeal set forth the applicable background to this claim:

> Immediately before opening statements, the prosecutor amended the indictment to reduce the charged offenses to only three counts-one count of malfeasance in office, one count of felony theft, and the prosecutor amended one count of malfeasance in office (original Count One) to a charge of public contract fraud.
>
> * * *
>
> [The charge of public contract fraud read:]

9

> [Defendant] did commit Public Contract Fraud, by using his power or position by instructing Town of Waterproof employees to purchase goods and services for the Town of Waterproof from a business or partnership of which he is a member, all in violation of R.S. 14:140.

During the presentation of the state's case, Robert "Bobby" Trahan, a senior auditor with the Legislative Auditor's office, testified that in May 2008, he went to Waterproof to investigate why the Town had not submitted financial statements for the fiscal year ending in June 2007 as required by law. He explained that the Mayor was prohibited by law from causing the Town to have a transaction with a business owned by the Mayor or an immediate family member. Trahan discovered "a number of charges" on the Town credit card at Higginbotham Place, a business allegedly owned and operated by the Mayor. This was the basis of the public contract fraud count.

The auditor also found charges on the Town's credit card for airline travel to Los Angeles, Chicago and Las Vegas. The auditor testified that, when he asked the Mayor whether these were personal expenses or related to Town business, Higginbotham first said that he did not know but later admitted that they were personal matters. This pertained to the malfeasance count on which defendant was convicted. The felony theft count involved Higginbotham increasing his salary from $12,000 to $36,000 yearly without approval from the Board of Aldermen.

The next witness for the state was Ted Higginbotham who is defendant's brother. The recording equipment for the courtroom malfunctioned, and thus there is no record or transcript of Ted Higginbotham's testimony. The next witness was Dr. Glenda Richardson, who was a business associate of defendant. Because of the malfunction with the recording equipment, this witness's testimony on direct examination was not recorded, so there is no transcript of that part of her testimony. The transcript commences at a point during cross-examination of the witness by defendant. This witness answered questions from defendant about defendant's ownership interest in the business, Higginbotham Place. On re-direct, the witness told the jury that Bobby Higginbotham owned "that store" despite the signatures of the witness and Ted Higginbotham on a partnership agreement.

The state rested its case after two days of trial. Defendant requested a continuance which the trial court denied. The next day, this court granted Higginbotham's writ application and allowed him a 30–day continuance.

During the delay, the trial court discovered that something had gone wrong with the recording equipment. As stated, the prosecution had presented evidence in support of the public contract fraud charge against defendant, which included the testimony of defendant's brother, Ted Higginbotham, and defendant's business partner, Dr.

10

Glenda Richardson. Because of the error in the court's recording equipment, Ted Higginbotham's testimony and much of Dr. Richardson's testimony were not recorded. Defendant moved for a mistrial. The state agreed to a mistrial as to the public contract fraud count. The trial judge granted a mistrial as to that count but denied defendant's motion for a mistrial as to the other two counts. The exhibits pertaining to the public contract fraud charge were removed from the record, and the jury was admonished to disregard the testimony and the exhibits.

*Higginbotham*, 122 So. 3d at 19-21.

On appeal, Petitioner argued that the trial court should have granted a complete mistrial because the trial court erroneously admitted "other crimes" evidence.  [doc. # 1-3, p. 128].  He argued that the State improperly used the withdrawn, mis-tried public contract fraud count, as well as evidence admitted in support thereof, to improperly bolster the remaining two counts.  *Id.* In other words, the "other crimes" evidence that he allege was improperly admitted was the public contract fraud count and evidence admitted in support thereof.  More pertinent here, Petitioner set forth a separate claim, arguing that the record was inadequate to review the "other crimes" claim because the record did not contain the testimony of the Ted Higginbotham and Dr. Richardson . . . testimony that was admitted in support of the withdrawn public contract fraud charge.  *Id.* at 115-117.

The appellate court rejected Petitioner's claims.  The court explicitly held that the alleged "other crimes" evidence was admissible under Louisiana's character evidence statute:

The other crimes evidence in this case was an indicted count of public contract fraud. Obviously, defendant had notice. It likewise represented a *modus operandi*, a method of operation. In both the malfeasance count and the public contract fraud count, defendant used the Town's credit card to enrich himself. We note in *State v. Busby, supra*, the state's entire case had been presented, and the defendant in *Busby* argued that the evidence already adduced as to the dismissed count was "other crimes" evidence which prejudiced the jury's consideration of the remaining counts.  La.C. Cr. P. art. 770(2) provides that upon motion of a defendant, a mistrial shall be declared when a remark or comment, made within the hearing of the jury by the

11

judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible.

In our case, the other crime evidence would have been admissible under C.E. 404 B(1). The Third Circuit Court of Appeal in *State v. Busby, supra*, and this court in *State v. Diggs*, supra, found that any prejudice resulting from the dismissal of one count was harmless beyond a reasonable doubt.

*Higginbotham*, 122 So. 3d at 22-23.  By addressing and rejecting the "other crimes" claim, the court implicitly rejected Petitioner's claim that the record was inadequate to review the "other crimes" claim.

Here, Petitioner has failed to prove that the missing testimony prejudiced his "other crimes" claim.  He essentially argues that the appellate court should not have ruled that the "other crimes" evidence was admissible because some of the evidence of the "other crimes" (i.e. the missing testimony of the two witnesses) was not available for review.  However, Petitioner fails to provide an affidavit or other like evidence revealing the content of the witnesses' testimony. In other words, Petitioner has not carried his burden of proving that the outcome of his appeal would have been different if the appellate court had been able to review the two witnesses' testimony; in fact, Petitioner has failed to present even the general substance of that testimony to this Court.

Alternatively, even if Petitioner had presented this Court with the substance of the missing testimony, the Court would nevertheless have little difficulty concluding that the missing testimony did not prejudice his appeal.  To explain, in addition to ruling that the "other crimes" evidence was admissible, the appellate court also ruled that the introduction of the evidence did

12

not prejudice Petitioner's trial.[5]  *Higginbotham*, 122 So. 3d at 22-23.  The court so ruled, not by speculating as to what the missing testimony may have been, but by finding that the evidence of guilt of the remaining two counts (i.e. the evidence that *was* properly transcribed and before the appellate court) "was overwhelming and [that] the guilty verdicts were surely unattributable to any error."  Consequently, even if the appellate court had been presented with the missing testimony, and assuming that the court had held that the evidence should not have been admitted at trial, the appellate court would not have reversed the conviction.

ii. Adequacy of the Record With Regard to Petitioner's *Batson* Claim

Petitioner next contends that he could not effectively pursue his *Batson* claim on appeal because the record is "marked 'inaudible' during his objection to the prosecutor's use of 100% (five of five) of its peremptory strikes to exclude otherwise qualified African-American jurors from the petit jury . . . ."  [doc. # 1-2, p. 30].  More specifically, Petitioner argues that the record was inadequate for the appellate court to determine whether the trial court found a *prima facie* case of discrimination, whether the prosecutor proffered race-neutral reasons for striking the jurors, and whether the prosecutor's proffered reasons constituted pretext for racial discrimination.  *Id.* at 31-32.

At *voir dire*, shortly after the prosecutor exercised a backstrike against juror Diane Perry, Petitioner[6] issued an implicit *Batson* challenge:

[N]ow you have, a pretty much, pretty much an all white jury, which is

---

[5] In Louisiana, an appealing defendant bears the burden of showing that he was prejudiced by the admission of "other crimes" evidence.  *State v. Dauzart*, 844 So. 2d 159, 165-66 (La. App. 5 Cir. 2003).

[6] Petitioner represented himself at *voir dire*.

unconstitutional.  Because who, . . . unconstitutional.  So now what you have essentially is one person of color on the jury pool that [the] State might use to guarantee a conviction.  And that, and that is a problem.  That is a problem.

[doc. # 11, Vol. 8, p. 1800].  Petitioner did not explicitly challenge any particular strike and did not indicate whether he was challenging multiple strikes.  *Id.*  The trial court's initial response in the record is marked, "Inaudible."  *Id.*  Nevertheless, the prosecutor proceeded to provide reasons for striking both juror Perry and juror Percy.  *Id.* at 1801.  The trial judge did not explicitly rule on Petitioner's *Batson* challenge; rather, he simply said, "I see," and proceeded to conduct *voir dire.  Id.*

On appeal, the Second Circuit held that the record was adequate to review Petitioner's claim and ultimately found that the trial court did not err in rejecting Petitioner's *Batson* challenge.  *Higginbotham*, 122 So. 3d at 23-25.  Specifically, the Second Circuit reasoned:

> [O]nce the prosecutor offers a neutral reason for a peremptory challenge, the question of whether defendant had made a prima facie showing of intentional discrimination is rendered moot.

> As outlined above, the determination that a party has made a prima facie case and that the proffered reasons are, or are not, race-neutral is a function of the trial court, who has the benefit of being in the presence of the jurors and the prosecutor. What is clear is that the prosecutor did give race-neutral reasons for the challenges and that the trial court did not require further explanation.  By its proceeding with the trial, the court implicitly denied defendant's *Batson* objection.

> A review of voir dire is instructive. The transcript of the state's back strikes shows that the state peremptorily challenged jurors Diane Perry, Willie Percy and Patrick McCraney. According to the prosecutor in brief, the other two African–American jurors who were excused were Amanda Gales and Johnny Coleman.

> The first of these jurors was Diane Perry.  Ms. Perry reported that she had been a child care worker for 18 years and that her husband, formerly a farmer, was unemployed.  Ms. Perry knew defendant and, in fact, had been employed "at his store in Waterproof back there" in 1999.

* * *

The second juror was Amanda Gales. Ms. Gales' boyfriend was incarcerated and facing criminal charges and according to her, he "was supposed to appear for today."

* * *

The third juror was Johnny Coleman, a truck driver and farmer in Pineville. The state had information that Coleman had a pending felony charge for second degree battery in Catahoula Parish. Coleman was unclear about the current status of his case, saying that he had not been to court since December 2003, that the case may have been "discontinued" and that he would have to look at the records to know. The state exercised a peremptory challenge after the issue could not be conclusively resolved.

The fourth juror was Willie Percy, a maintenance worker for the Tensas Parish School Board. Percy had also worked for the Town of St. Joseph as a patrolman. He had a conviction for possession of marijuana in 1975. He said that he had no "axe to grind" with the state and that his offense was a misdemeanor.

* * *

The fifth juror was Patrick McCraney, a truck driver from Newellton. His wife worked for the Community Head Start in St. Joseph. McCraney's wife, Marilyn, was also on the prospective jury panel. During her voir dire, she said that she would hold the state to a higher burden of proof than required by law because "I've dealt with Mr. Higginbotham, and ah, he's been, I mean, he's done a lot for Head Start."  By contrast, McCraney said that he could return a verdict of guilty for defendant if the state could prove its case beyond a reasonable doubt.

*Id.* at 24-25 (citations omitted).

Here, Petitioner fails to prove that the missing testimony prejudiced his appeal.  Just as above, Petitioner fails to provide the Court with evidence revealing the general content of the missing portions of the transcript—or in this case the portions of the transcript marked "inaudible."  In other words, Petitioner has not carried his burden of proving that the outcome of his appeal would have been different if the appellate court was able to review the supposedly missing *Batson* discussion because Petitioner has failed to present even the general substance of

15

that discussion to this Court.  In addition, very little of the transcript is missing . . . or in this case, marked "inaudible."  Thus, it is unlikely that the appellate court would have ruled otherwise when presented with the brief inaudible remarks.

However, construing his briefing liberally, Petitioner could be arguing that the portions of the transcript marked "inaudible" are more than minor comments and are instead lengthy discussions regarding his *Batson* challenge.  For instance, Petitioner could be arguing that the inaudible portions were in fact discussions regarding his *prima facie* case of discrimination, the prosecutor's presentation of race-neutral reasons for striking the African-American jurors, and the trial judge's reasons for denying the *Batson* challenge.  That said, Petitioner must show that the appellate court would have found that the trial court's ultimate ruling on the issue of discriminatory intent was clearly erroneous if the appellate court was able to review this allegedly missing discussion.  *See Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) ("On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.").

The key is that the Petitioner must show that the appellate court would have overturned the trial court's ultimate ruling, as opposed to merely disagreeing with the trial court's reasons for so ruling.  In that regard, if Petitioner presented everything that he implicitly alleges is lacking from the record to the appellate court, the appellate court's ruling would not have differed.  To explain, suppose that the appellate court had been presented with the trial court's *prima facie* finding of discrimination, the prosecutor's proffered race-neutral reasons, and the trial court's reasons for determining that Petitioner did not show purposeful discrimination.  These portions of the record would have only proved, respectively, that the trial court did make a *prima facie*

finding, that the prosecutor did proffer race-neutral reasons, and that the trial court did deny

Petitioner's challenge.  All of this *voir dire* discussion would bolster the appellate court's

decision to affirm the trial court's holding.

The same result would obtain even if the appellate court disagreed with the trial court's

reasoning.  Again to explain, suppose that the appellate court had been presented with the trial

court's rationale in denying Petitioner's *Batson* challenge and that the appellate court vehemently

disagreed with that reasoning.  Suppose further that the appellate court also disagreed with the

prosecutor's race-neutral reasons for striking the jurors.  Even then, it is clear that the appellate

court's ruling would not have differed because the appellate court independently reviewed the

*voir dire* discussion involving the struck jurors—discussion that is not missing from the

record—and held that, considering the great deference owed, the trial court's ultimate

determination was not clearly erroneous.  *See State v. Anderson*, 996 So. 2d 973, 1006 (La. 2008)

(reviewing the record, as opposed to the trial judge's reasoning, and finding that the trial judge's

ultimate finding of no discriminatory purpose was "borne out by the record.").

    iii. <u>Adequacy of the Record With Regard to Petitioner's Claim that he was Denied a</u>
       <u>Peremptory Strike</u>

Petitioner contends that he could not effectively pursue, on appeal, his claim that he was

improperly denied a peremptory strike during *voir dire* because the record is "marked 'inaudible'

during critical portions of the jury selection."  [doc. # 1-2, p. 33].  More specifically, Petitioner

contends: "During jury selection, [he] attempted to use his sixth and final peremptory strike to

excuse Juror Harry Goldman from the petit jury.  The trial court denied [his] final peremptory

strike."  *Id.*  The Second Circuit set forth the applicable background , as well as its ruling, as

follows:

Defendant complains that the trial court erred when it denied his challenge to venireman Harry Goldman, III, an attorney. Defendant first stated that he wanted to challenge the juror peremptorily, but later changed his challenge to one for cause, which the court denied on the grounds that the juror's occupation as an attorney was not a basis for a cause challenge.

Jury selection was not overly long in this case. Defendant's peremptory challenges were as follows: Gracie Jesseph, David Lutken, and Barclay Tullos. At that point the judge said that they had six jurors. Defendant was told that he still had three peremptory challenges.

After this exchange, despite the fact that the jury had been completed with six jurors, selection continued without discussion of an alternate. The next juror defendant challenged was Audrey Hemphill. To that challenge, the court responded, "Defense peremptory number 5." Thereafter, the parties did not agree on any of the remaining jurors in the first panel of 12.

However, when the court informed the excused jurors from that first panel that they could leave the courtroom, the court excused venireperson Melinda Fuller. The record shows that the state originally accepted Ms. Fuller and that defendant said, "Okay, that's fine." No explanation appears in the transcript for excusing this juror.

In the next panel, defendant peremptorily challenged juror Linda Outlaw. After a state challenge for cause, the next juror called was Harry Goldman, III. The record reflects:

Prosecutor: We would accept.

Defendant: I don't have any more challenges. Can I challenge for cause? That's the lawyer. He's a lawyer. And the law says that attorneys....

After the trial court denied defendant's challenge for cause, Mr. Goldman was made a member of the jury.

Thus, the record suggests, but does not conclusively show, that defendant was allowed only five peremptory challenges rather than six.

However, the record strongly suggests that defendant exercised a peremptory challenge to excuse venireperson Melinda Fuller. There is no explanation in the transcript for the removal of Ms. Fuller, but the record shows that the parties had selected six jurors just prior to defendant's apparent request to use a peremptory

18

challenge to strike one of the previously accepted jurors, i.e., Melinda Fuller.  From that point, the parties continued selecting jurors because they had selected only five jurors; thus, it seems reasonable to assume that the transcript simply does not reflect that defendant excused Ms. Fuller at the point where he apparently asked to strike one of the previously accepted jurors.

If defendant was actually denied one of his peremptory challenges, that is potentially a reversible error.  However, it appears that the record is simply incomplete or inaccurate, perhaps because of something inaudible-as it is in many other places in the transcript—and does not show that the trial court's count of peremptory challenges is incorrect.

*Higginbotham*, 122 So. 3d at 32-33.

Here, Petitioner has again failed to demonstrate how the absent portions of the record prejudiced his appeal.  Petitioner has not presented the Court with any evidence detailing what he believes is absent from the record.  Thus, the Court is no position to say that the appellate court would have ruled otherwise had it been presented with any missing portions of the transcript.

For the foregoing reasons, the Second Circuit's denial of Petitioner's Claim regarding the adequacy of the record was not contrary to, or an unreasonable application of, Supreme Court precedent.  It is recommended that Petitioner's Claim be **DENIED**.

C. Claim Three: Motion To Quash The Jury Venire

Petitioner claims that he was deprived of his right to a fair and impartial jury because the jury venire did not reflect a fair cross-section of the community.  [doc. # 1-2, p. 35].  Specifically, he complains that his venire was under represented by African-American venire members.  *Id.* at 36-38.  Petitioner first raised this issue on March 29, 2010, shortly before trial.  [doc. # 11, Vol. 1, p. 200].

In *Duren v. Missouri*, the Supreme Court stated that in order to establish a *prima facie* violation of the fair-cross-section requirement, a petitioner must show: (1) that the group alleged

to be excluded is a 'distinctive' group in the community; (2) that the representation of this group

in venires from which the juries are selected is not fair and reasonable in relation to the number

of such persons in the community; and (3) that this under-representation is due to systematic

exclusion of the group in the jury-selection process.  *Duren v. Missouri*, 439 U.S. 357, 364

(1979).

> Here, the Second Circuit properly invoked and applied the *Duren* standard:
>
> Defendant challenged the jury venire as a whole (i.e., not the selected jury) on the grounds that the venire disproportionately underrepresented African-Americans. At the hearing on this motion, defendant asserted that only 40% of the 150-person jury pool was African-American, yet the racial makeup of the parish was nearly equal between African-Americans and whites.
>
> Defendant argued that only 40% of the jury pool was African-American, but the Clerk of Court for Tensas Parish testified that the pool, going back to 2005, was 49.8 percent African-American and 48.5 percent white, and the particular jury pool available for defendant's trial was 52% African-American and 47% white. Further, defendant had no proof that any "alleged" underrepresentation was due to systematic exclusion of African–Americans; the clerk explained that the drawing of the pool was done randomly by computer from voting and Department of Motor Vehicle records.
>
> Defendant failed to show that the representation of African-Americans in the Tensas Parish jury venire was not fair and reasonable in relation to the number of such persons in the community. *See Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). The motion to quash was properly denied.

*Id.*

A review of the state court record shows that the appellate court's findings were entirely

reasonable.  This is especially true considering the fact that Petitioner cites only his particular

venire composition and does not allege any systematic exclusion.[7]  Accordingly, the Court cannot

say that the state court's application of *Duren* was objectively unreasonable.  Petitioner's claim

---

[7] To satisfy the "systematic exclusion" element, under representation must be shown to be inherent in the particular jury-selection *process* utilized.  *See Duren*, 439 U.S. at 366.

for relief should be **DENIED**.

D. Claim Four: *Batson* Claim

Petitioner contends that the trial court erred in allowing the prosecutor to purposefully

exclude African-American jurors at voir dire.  [doc. # 1-2, p. 37].  The facts and relevant

procedural history underlying this Claim are recounted above in Section B(ii).

*Batson* requires defendants to demonstrate that the State used peremptory challenges in

violation of the Equal Protection Clause.  *Batson v. Kentucky.*, 476 U.S. 79, 96-98 (1986).  The

*Batson* Court created a three-step analysis for trial courts to use in evaluating a defendant's claim

of a racially discriminatory peremptory challenge.  *Id.*  First, "a defendant must make a *prima*

*facie* showing that the prosecutor exercised his peremptory challenges on the basis of race."  *Id.*

at 96.  Second, "[o]nce the defendant makes a *prima facie* showing, the burden shifts to the State

to come forward with a [race] neutral explanation" for the use of the peremptory challenge.  *Id.* at

97.  Third, and finally, the "trial court then will have the duty to determine if the defendant has

established purposeful discrimination."  *Id.* at 98.

In *Hernandez v. N.Y.*, 500 U.S. 352, 360 (1991), the Supreme Court held that the reasons

offered to explain the exercise of a peremptory challenge should be deemed race-neutral unless a

discriminatory intent is inherent in those reasons.  In addition, the Court stated that a reviewing

court should give a trial judge's factual findings on discriminatory intent great deference and

should not reverse them unless they are clearly erroneous.  *Id.* at 364-65.  The presumption of

validity attaching "to a trial court's factual finding at *Batson's* third step . . . is doubly strong

when the *Batson* finding is under collateral attack in *habeas*."  *Miller-El v. Dretke*, 545 U.S. 231,

284 (2005).  Consequently, the Court in *Rice v. Collins*, 546 U.S. 333, 334 (2006), admonished courts from substituting their evaluation of the record for that of the trial judge.

Here, Petitioner argues that "the state used all five of [its] peremptory challenges . . . to strike African-Americans . . . ."  [doc. # 1-2, p. 37].  However, at *voir dire*, Petitioner did not specify which of the State's multiple peremptory strikes he wished to challenge.  [doc. # 11, Vol. 8, p. 1800].  Petitioner only argued, "Because now you have, a pretty much, pretty much an all white jury, which is unconstitutional."  *Id.*  Although unaware of which strikes Petitioner was challenging, the State nevertheless proffered reasons for striking two African-American venire persons: Perry and Percy.  *Id.* at 1801.  The trial judge then tacitly accepted the State's proffered race-neutral reasons for striking the two venire persons by proceeding with *voir dire*.  *Id.*

As to venire persons Perry and Percy, the trial judge had the benefit of observing firsthand the jury panel, the attorneys, the questions asked, and the overall atmosphere of the *voir dire*.  The judge was in the best position to determine whether the State's peremptory challenges constituted purposeful discrimination.[8]  On this record, Petitioner has failed to present clear and convincing evidence to refute the trial judge's implicit findings.

Of course, this Court cannot defer to the trial court's factual findings regarding the credibility of the State's reasons for striking the remaining three African-American venire persons because the State offered no such reasons.  In all likelihood, the State failed to address the strikes of the three venire persons because Petitioner failed to specify which of the State's

---

[8] To be sure, the judge did not make any explicit findings regarding the State's proffered race-neutral reasons; however, this Court is "bound by the state [trial] court's factual findings, both implicit and explicit."  *Stevens v. Epps*, 618 F.3d 489, 499 (5th Cir. 2010); *see also Santellan v. Cockrell*, 271 F.3d 190, 193-94 (5th Cir. 2001) (ultimate ruling of state court entitled to deference even if no explanation for ruling is given).

peremptory strikes he was challenging.  Nevertheless, even construing Petitioner's *Batson*

challenge liberally and supposing that he did challenge all five of the State's peremptory strikes

of African-American venire persons, Petitioner has failed to show that the appellate court's

ruling constituted an unreasonable application of *Batson*.  As recounted above in Section B(ii),

the appellate court independently reviewed the voir dire testimony of all five African-American

venire persons and held that the "trial court did not err in rejecting defendant's *Batson*

challenges."  *Higginbotham*, 122 So. 3d at 25.  The appellate court provided sufficient

independent justification for its decision and this Court is unable to conclude that its ruling was

unreasonable.[9]  Petitioner's Claim should be **DENIED**.

E. Claim Five: Disqualification Of Counsel

Petitioner claims that the Louisiana courts erred when they held that his "assignment of

error regarding the disqualification of his counsel of choice was without merit."  [doc. # 1-2, p.

---

[9] It is of no moment that the trial judge failed to conduct an explicit *Batson* analysis.  In *Moody v. Quarterman*, 476 F.3d 260, 268 (5th Cir. 2007), the Fifth Circuit held that deference to a state appellate court's decision with regard to a defendant's *Batson* claim was appropriate even where the trial court failed to conduct a proper *Batson* hearing.  There, the appellate court conducted the entire *Batson* analysis on its own.  *Id.*

It is similarly of no moment that the prosecutor only proffered race-neutral reasons for striking two of the five African-American venire persons because "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."  *Purkett v. Elem*, 514 U.S. 765, 768 (1995).  The Supreme Court has stated: "In the unlikely hypothetical in which the prosecutor declines to respond to a trial judge's inquiry regarding his justification for making a strike . . . [s]uch a refusal would provide additional support for the inference of discrimination raised by a defendant's prima facie case."  *Johnson v. California*, 545 U.S. 162, 171 (2005).  In so stating, the Supreme Court indicated that a failure to provide an explanation for exercising a strike does not relieve the trial court of its obligation to make the final determination of whether there has been purposeful discrimination.

39].  The Second Circuit set forth the applicable background to this claim, as well as its ruling, as

follows:

> [I]n March 2009, the district court disqualified defendant's retained attorney, Karl
> Koch, from representing defendant in this criminal case because it found that the
> attorney had a conflict of interest due to his concurrent representation of the Town
> of Waterproof, the victim of the alleged offenses by defendant.  Higginbotham sought
> supervisory review in this court, which granted the application and affirmed, agreeing
> that the attorney had a conflict of interest.
>
> On appeal, defendant argues that the trial court violated his right to counsel of his
> choice, a structural error that cannot be harmless and requires reversal.
>
> This issue was fully litigated in 2009, well before trial. Typically, a court will not
> revisit an issue on appeal that has previously been decided on a writ application
> granted on the merits; this is the "law of the case" doctrine. Nothing in the record and
> no other developments in this prosecution require reexamination of this issue which
> was previously decided by this court. Defendant's choice of Mr. Koch as his attorney
> was clearly unacceptable. Accordingly, this assignment of error is without merit.

*Higginbotham*, 122 So. 3d at 26 (internal citations omitted).

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall

enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.

The right to counsel guaranteed by the Sixth Amendment includes "the right to the effective

assistance of counsel," *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970), whose

performance is not adversely affected by an actual or potential conflict of interest that imperils

the defendant's right to a fair trial.  *See Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).  In

addition, a defendant's right to counsel includes the right to retain the counsel of his choosing.

*See Wheat v. U.S.*, 486 U.S. 153, 159 (1988).

24

In *Wheat*, the Supreme Court recognized a presumption in favor of affording a defendant his choice of counsel.  *Id.* at 164.  The presumption favoring counsel of choice, however, "is circumscribed in several important respects."  *Wheat,* 486 U.S. at 159.  For example, a defendant may not "demand that a court honor his waiver of conflict free representation."  *U.S. v. Gonzalez-Lopez*, 548 U.S. 140, 152 (2006) (citing *Wheat*, 486 U.S. at 159-60).  Where a conflict is alleged as the basis for counsel's disqualification, "[t]he evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court." *Wheat*, 486 U.S. at 164.  In that respect, the presumption in favor of a defendant's counsel of choice "may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict."  *Id.*

Here, it is clear that an actual conflict of interest existed.  As indicated above, Petitioner's attorney, Koch, also represented the Town of Waterproof through its Aldermen and Mayor.  All of the criminal indictments against Petitioner involved situations in which the Town of Waterproof and its Aldermen were victims of Petitioner's crimes.  As the prosecution stated before trial, "In order to properly represent [Petitioner] in these criminal matters, Mr. Koch must take positions completely adverse to the Aldermen, the Town, and its citizens."  [doc. # 11, Vol. 1, p. 115].  As a result of the conflict, Koch could not continue to represent Petitioner without breaching his duty of loyalty to the Aldermen, the Town, and its citizens.   Moreover, as the State argued, if Koch was not disqualified, Petitioner "would have legitimate grounds to argue [on appeal] that his counsel was ineffective because his attorney's representation of the Town and the Board of Aldermen hamstrung his effort to effectively defend him."  *Id.* at 116.

The Court finds that the trial court was obligated to disqualify Koch—even when confronted with Petitioner's attempted waiver—in light of this clear conflict of interest.  More importantly, this Court cannot say that the appellate court's decision in upholding the trial court's ruling was contrary to, or an unreasonable application of federal law as determined by the Supreme Court, especially given the deference the appellate court owed to the trial court's judgment.

F. Claim Six: Violation of Right to Counsel

Petitioner claims that the trial court violated his right to counsel by forcing him to represent himself.  [doc. # 1-2, p. 41].  The Second Circuit denied Petitioner's claim, holding that "it is apparent that defendant's uncounselled status through the first half of his trial was wholly his own choice, a decision made by his deliberate manipulation of his right to counsel in an effort to derail the orderly progress of the prosecution."  *Higginbotham*, 122 So. 3d at 27.  The Second Circuit stated further:

> At the outset, defendant retained counsel with a clear conflict of interest, and once that attorney was excused from the case, defendant repeatedly and stubbornly refused either to retain an attorney or request that an indigent defender be appointed for him.  Approximately two months before trial, the district judge patiently explained to Higginbotham, who has an advanced education including an M.B.A. degree, that he must either retain an attorney or request that the public defender be appointed before his next appearance in February 2010.  At that next appearance, defendant told the court:
>
>> Your Honor, under advice of counsel, I'm gonna take the Fifth, under the U.S. Constitution.  I have no comment to make to the Court until a counsel is enrolled.
>
> Clearly at this time, defendant was receiving advice from one or more attorneys—a fact he also admitted at his pauper hearing—yet he again deliberately chose neither to enroll an attorney for himself nor to request the appointment of the public defender.

26

At trial, after jury selection began, defendant requested the appointment of the public defender, but an examination of defendant's finances led the trial court to conclude that defendant was not indigent and could afford to retain an attorney. On the evidence adduced in the record, that finding is not manifestly erroneous, and indeed defendant did retain an attorney to present a case after the recess in the trial.

As to defendant's objection, the trial court stated, "This court is of the firm opinion that defendant has manipulated his right to counsel in an effort to delay or prevent trial." The trial court's conclusion is amply supported by the record. Defendant's conduct was a deliberate attempt by him to disrupt the orderly proceedings . . . .

*Id.* (internal emphasis omitted).

As additional background, Petitioner stated on February 24, 2010: "Based on recommendation from an advice of counsel, because once the, once the counsel is in place, those matters will be taken up at that point. . . . I think it's important that the Court take notice of the fact that we're gonna have legal counsel handle these matters for us going forward." [doc. # 11, Vol. 7, p. 1476, 1478]. The trial court informed Petitioner that he had "been given an opportunity to have an attorney [] for the last several months . . . [a]nd no one has enrolled." *Id.* at 1479. Later that day, the trial court asked Petitioner if he had an attorney or if he had made arrangements to hire an attorney, to which Petitioner replied, "I'm gonna take the fifth." *Id.* at 1485. The trial court proceeded to appoint standby counsel over Petitioner's objection and informed Petitioner that he was always free to retain an attorney. *Id.* at 1486. The court stated, "if you don't have an attorney by the trial, it will not, it will not keep us from going forward on the trial." *Id.*

On March 29, 2010, the trial court asked Petitioner: "Did you plan to represent yourself? Did you not retain counsel because you wanted to cause problems for the case going forward?" . . . . [I]f the court granted a continuance, would you, do you plan [to] have an attorney retained . . .

27

?" *Id.* at 1624.  Petitioner informed the court that he was going to "have an attorney to try this case for [him]." *Id.* at 1626.  With regard to his request to continue the case, Petitioner stated, "I mean, if, if we [have already] waited a year, what's two more months to prepare a defense . . . ?" *Id.*  The court warned Petitioner that he could not "manipulate a trial, or manipulate the court in setting of trial by refusing to cooperate." *Id.* at 1629.

On March 30, 2010, Petitioner told the court that he was receiving consultation from various attorneys, yet Petitioner still had not retained an attorney.  [doc. # 11, Vol. 8, p. 1828]. Petitioner stated that he would retain counsel after he determined whether the counsel he wanted to retain had a conflict of interest.  *Id.* at 1828.  In the same colloquy, despite the fact that any failure to retain counsel was clearly Petitioner's fault, Petitioner claimed that the trial court was forcing him "into a trial without representation." *Id.* at 1829.

In *Faretta v. California*, the Supreme Court held that a criminal defendant has the constitutional right to waive his right to counsel and present his own defense.  *Faretta v. California*, 422 U.S. 806, 817-22 (1975).  Waiver of that right must be knowing and intelligent. *Id.* at 835.  In *McQueen v. Blackburn*, the Fifth Circuit summarized factors that must be evaluated when considering the sufficiency of a waiver of the assistance of counsel:

> The court must consider the defendant's age and education, and other background, experience, and conduct. The court must ensure that the waiver is not the result of coercion or mistreatment of the defendant and must be satisfied that the accused understands the nature of the charges, the consequences of the proceedings, and the practical meaning of the right he is waiving.

*McQueen v. Blackburn*, 755 F.2d 1174, 1177 (5th Cir. 1985) (internal citations omitted).[10]

---

[10] Although a number of courts require trial courts to conduct a hearing or colloquy with the defendant before finding a valid waiver, the Fifth Circuit does not.  In *Wiggins v. Procunier*, 753 F.2d 1318, 1320 (5th Cir. 1985), the Fifth Circuit, reviewing a state prisoner's petitioner for

More pertinent here, courts have found that a defendant's attempt to delay or otherwise derail the trial process, including postponing the retention of counsel, constitutes waiver of counsel. *See* Sarah Gerwig-Moore, *Gideon's Vuvuzela: Reconciling the Sixth Amendment's Promises with the Doctrines of Forfeiture and Implicit Waiver of Counsel*, 81 MSLJ 439, 453 (2012) (cataloguing various courts' approaches on the subject). For instance, in *U.S. v. Terry*, 449 F.2d 727 (5th Cir. 1971), the Fifth Circuit rejected a defendant's right to counsel claim where the defendant failed to secure counsel within a reasonable time. The *Terry* court stated that the defendant's "freedom of choice of counsel may not be manipulated to subvert the orderly procedure of the courts or to interfere with the fair administration of justice." *Id.* The court stated further: "The defendant is incorrect in his assumption that the Sixth Amendment Rights have been newlywrapped in a climate which affords a defendant the right to obtain a delay at his whim and caprice, or to obtain a reversal because he was unable to frustrate justice." *Id.* (citation omitted); *see also, King v. Bobby*, 433 F.3d 483, 485-86 (6th Cir. 2006) (holding that, by rejecting all options other than proceeding *pro se*, the defendant effectively chose self-representation); *Spevak v. U.S.*, 158 F.2d 594, 596 (4th Cir. 1947) ("It seems clear that an accused who is able to employ counsel and fails to do so after being afforded opportunity, thereby waives the right and may not urge lack of counsel as excuse for delay."); *cf. Neal v. Texas*, 870 F.2d 312, 315 (5th Cir. 1989) ("After a defendant has been given a fair or reasonable opportunity to obtain counsel of

---

writ of *habeas corpus*, held: "We are convinced that a colloquy between a defendant and a trial judge is the preferred method of ascertaining that a waiver is voluntary, knowing, and intelligent. However, we have never required such a colloquy as a "bright-line" test in cases of this type, and we decline to do so now. In order to determine whether the right to counsel has been effectively waived, the proper inquiry is to evaluate the circumstances of each case as well as the background of the defendant."

choice, the decision to grant or deny a continuance to permit a further opportunity to do so rests within the broad discretion of the trial court.").  With all of that said, the United States Supreme Court has not addressed the constitutionality of implicit waiver of the right to counsel via dilatory, uncooperative, or manipulative behavior.[11]

Here, Petitioner has failed to demonstrate that the Second Circuit's finding of waiver was contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  The record is replete with instances in which Petitioner constructively chose to proceed without counsel (or chose to not enroll the counsel allegedly giving him advice).  The trial judge warned Petitioner that the court would not continue the case indefinitely while waiting for Petitioner to engage counsel.  In the face of this warning, Petitioner continued his capricious efforts to delay the proceedings by cryptically indicating that he was receiving advice of counsel yet refusing to retain that counsel.

Petitioner claims that his entreaty to the trial court to not force him to trial without counsel proves that he did not waive his right to counsel.  However, when Petitioner's entreaty is

---

[11] It is worth noting that the Supreme Court denied certiorari in *State v. Jones*, 772 N.W.2d 496 (Minn. 2009), a case with facts similar to the one at bar.  Sarah Gerwig-Moore, in *Gideon's Vuvuzela, supra*, summarized the *Jones* case:

> In Jones, the trial court conducted a brief colloquy during which Jones acknowledged that he had the right to an attorney, but that he did not qualify for representation by a public defender. Although after appropriate warnings, he agreed that he would represent himself, Jones told the trial court that he considered himself "a sitting duck, basically a target" without counsel. Although the appellate court held the record did not support a conclusion that Jones had waived his right to counsel, it held that Jones had forfeited it in his extremely dilatory conduct and failure to engage counsel despite acknowledging the risks of proceeding pro se.

juxtaposed with his immediately preceding refusal to enroll counsel, it becomes clear that

Petitioners's true intent was to derail the expeditious prosecution of his case.

Because Petitioner was non-indigent and repeatedly refused to retain counsel, the Court

finds that Petitioner impliedly requested to proceed *pro se* and effectively waived his right to

counsel through his dilatory behavior.  Moreover, Petitioner's age, education, *pro se* filings,[12] *pro*

*se* orations at pre-trial hearings[13], and other conduct prior to trial all buttress the reasonableness

of the Second Circuit's finding that Petitioner intelligently and knowingly waived his right to

counsel.  Stated differently, Petitioner knew what lay ahead of him and understood the risk of his

continued obstructionist behavior.[14]  Petitioner's claim should be **DENIED**.

G. <u>Claim Seven: Standby Counsel</u>

Petitioner claims that the first public defender appointed to assist him, Leroy Smith, had a

conflict of interest that precluded him from representing Petitioner, and that the conflict carried

over to the other attorneys employed by the public defender's office, including the second public

defender appointed, Jamie Crews.  [doc. # 1-2, p. 45-47].  According to Petitioner, Smith was

conflicted because he "represented a plaintiff in a civil suit naming [Petitioner] as a defendant . . .

---

[12] In fact, the trial court stated that "the work that you've been producing certainly gives
the impression that, you know, it's prepared by an attorney."  [doc. # 11, Vol. 8, p. 1619].

[13] For example, Petitioner acknowledged the risks of proceeding *pro se* when he stated:
"So, I mean, if I, if I knew the law the way some of the other folks know the law, then of course,
it wouldn't have taken as long.  But I think that courts have taken notice to give some tolerance
to those of us who are not members fo the bar in preparing, and we have a right to defend
ourselves but not to the same degree as members of the bar can do so.  So therefore, because I'm
not a member of the bar, I don't have a legal education, I'm asking this court's indulgence for us
to move forward and let us prepare defense and come forward."  [doc. # 11, Vol. 7, p. 1619].

[14] Out of an abundance of caution, the trial court appointed standby counsel to assist
Petitioner in the presentation of his case.  [doc. # 11, Vol. 8, p. 1830].

31

." *Id.* at 46-47.  Citing *Holloway v. Arkansas*, 435 U.S. 475 (1978), Petitioner argues that his conviction should be automatically reversed because, "At the point that [the trial court] became aware of Mr. Smith's conflict, the trial court was obligated to 'either appoint separate counsel or to take adequate steps to ascertain whether the risk [of a conflict of interest] was too remote to warrant separate counsel.'" *Id.* at 47.

The Supreme Court, in *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980), held that "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Here, neither Petitioner nor his standby counsel raised an objection at trial.  Recognizing the lack of objection, the Second Circuit denied Petitioner's claim and reasoned that "there is no evidence that whatever conflict that may have existed affected the attorney's performance and the nature of the conflict is not well developed in the record–which it would have been had there been an objection." *Higginbotham*, 122 So. 3d at 27-28.

A review of the record shows that the appellate court's finding was entirely reasonable. By extension, this Court does not find that the appellate court's finding was contrary to, or an unreasonable application of clearly established federal law as determined by the Supreme Court.

H. Claim Eight: Denial of Complete Mistrial

The relevant factual and procedural background of this Claim is detailed above in Section B(i).  Petitioner sets forth, in essence, two separate claims.  First, in brief, Petitioner argues that the trial court should have granted a complete mistrial, as opposed to granting a partial mistrial,

after learning that the trial court's recording equipment failed to record the testimony of witnesses Ted Higginbotham and Dr. Glenda Richardson.  [doc. # 1-2, p. 48].[15]

As to Petitioner's first claim, there is no mention or argument of any federal constitutional issue that this Court can ascertain.  "Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law unless a federal issue is also presented." *Leblanc v. Quarterman*, 2008 WL 2330746 at *6 (N.D. Tex. 2008); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996).  Rather, "[f]ederal habeas corpus review is limited to errors of constitutional dimension . . . ." *Castillo v. Johnson*, 141 F.3d 218, 222 (5th Cir. 1998).   In the course of reviewing state proceedings, a federal court does not sit as a super state appellate court. *Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986).  Consequently, review of Petitioner's first claim is not proper.

Next, Petitioner argues that by granting only a partial mistrial and allowing the trial to go forward on the remaining claims, the trial court indirectly and erroneously admitted "other crimes" evidence.  To explain, Petitioner contends that the testimony and physical evidence presented on the withdrawn public contract fraud charge constituted inadmissible "other crimes" evidence with respect to the remaining charges.

The majority of Petitioner's argument centers around the violation of LA. CODE EVID. ANN. art. 404.  As to the alleged violation of the state statute, Petitioner makes no constitutional challenge.  "In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law." *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998).  Thus,

---

[15] Many of Petitioner's arguments presented in this Claim are repetitive and were addressed above in Section B(i).

Petitioner's claim with respect to Article 404 is not cognizable here.

To the extent Petitioner's claim can be construed as asserting a claim for denial of due process, the claim is likewise without merit. The Supreme Court has held that the admission of evidence may violate the Due Process Clause of the Fourteenth Amendment if the evidence is "so unduly prejudicial that it renders the trial fundamentally unfair . . . ." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). Here, even if Petitioner could show that the evidence was improperly admitted under Louisiana evidentiary law[16], federal *habeas* relief still would not be warranted. The Fifth Circuit has explained:

> We will not grant habeas relief for errors in a trial court's evidentiary rulings unless those errors result in a "denial of fundamental fairness" under the Due Process Clause. The erroneous admission of prejudicial evidence will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant's conviction.

*Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998) (citations omitted).

The Court cannot say that the evidence of Petitioner's prior acts played a crucial, critical, or highly significant role in his conviction. The Court agrees with the Second Circuit's observation that "the evidence of defendant's guilt of the remaining two counts was overwhelming and the guilty verdicts were surely unattributable to any error." *Higginbotham*, 122 So. 3d at 22. Accordingly, the admission of the evidence did not result in a denial of fundamental fairness. Petitioner's assignments of error are without merit and should be **DENIED**.

I. Claim Nine: Admission of "Other Crimes" Evidence

---

[16] The Second Circuit held that the trial court did not err in admitting the evidence. *Higginbotham*, 122 So. 3d at 23.

34

Petitioner claims that the trial court improperly admitted prejudicial and irrelevant "other crimes" evidence in violation of LA. CODE EVID. ANN. art. 404.  [doc. # 1-2, p. 52].  The evidence at issue comprises various documents and testimony showing that Petitioner paid bonuses to local police officers for writing a high volume of tickets.  *Id.* at 54.

However, just as above in Claim Eight, Petitioner makes no constitutional challenge as he only alleges a violation of Louisiana law.  To the extent that his Claim can be construed as asserting a constitutional challenge, the Claim is without merit.  The Court is unable to conclude that the evidence played a crucial, critical, or highly significant role in Petitioner's conviction. Petitioner's Claim should be **DENIED**.

J. Claim Ten: Refusal to Allow Petitioner to Argue that His Prosecution was Politically Motivated

Petitioner claims that his right to present a complete defense was infringed upon when the trial court granted the State's motion to exclude evidence of Petitioner's mayoral reinstatement. *Id.* at 55.  The Second Circuit set forth the applicable background as follows:

> During the recess of the trial, the state filed a motion in limine seeking to exclude evidence or argument from defendant "about any information that may relate to the May 7, 2010, Second Circuit Court of Appeal ruling re-instating defendant as Mayor of Waterproof ... or about who is or who is not the Mayor of Waterproof."  In arguing on that motion, defendant urged that such a limitation would prohibit him from fully presenting a defense because, as defense counsel stated, "But what I've read, I believe a lot of it is politically motivated." Counsel further argued, "The whole thing is about [what] he's done in office. And the State arguing that's illegal, his activities, which are not. And that's what we hope to prove in this case. So we're being limited in our ability to present that defense, if we can't mention the fact that he is [sic] officially been placed back into office, which he really wasn't legally taken out to begin with."
>
> The court did not grant the state's motion in its entirety; rather, the court said that it would grant the motion:

> [T]o the extent that I already have during opening, I believe it was during the opening statements, there was an effort to discuss political motivation and "this is a witch hunt" kind of argument. And that was disallowed already. So I think I would be changing my ruling if I said that now you can bring in political motivation and that kind of thing.  So to that extent I will grant it and rule that it's inadmissible.  If there're other things that counsel wish to discuss as we go along, about, you know, what's admissible and what's not, I'll have to rule on it as it comes.

*Higginbotham*, 122 So. 3d at 28.  Interestingly, Petitioner does not now claim that the prosecution was politically motivated; rather, he claims only that the trial court erred in not permitting Petitioner to argue that the prosecution was politically motivated.  In other words, he assigns error to the trial court, not the prosecution.

Contrary to Petitioner's argument that he was not allowed to argue that the prosecution was politically motivated, as well as the trial judge's instruction to avoid discussion of political motivation, the record shows that Petitioner at trial argued at length that the prosecution was politically motivated.  For instance, in opening argument, Petitioner argued that he was "the victim of a political witch hunt," that the State "filed suit against [him] because he was holding the position of mayor and interim police chief," and that "[i]f you don't play by the political games, political rules that they've set down, they come after you."  [doc. # 11, Vol. 8, p. 1857, 1864, 1873].  Petitioner "was able to probe his allegations, through his questioning, that the prosecution was politically motivated."  *Higginbotham*, 122 So. 3d at 1.  Consequently, as Petitioner's argument that he was prevented from arguing selective prosecution is belied by the record, he is now reduced to arguing that the trial court deprived him of his right to present a

complete defense by erroneously excluded evidence showing that he was re-instated as the mayor of Waterproof, Louisiana.[16]

The right to present a complete defense under the Sixth Amendment "is an essential attribute of the adversary system." *Taylor v. Illinois*, 484 U.S. 400, 408 (1988). "However, this right is limited and must be weighed against the countervailing interests in 'the integrity of the adversary process . . . the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process.'" *U.S. v. Mizell*, 88 F.3d 288, 294 (5th Cir. 1996) (citing *Taylor*, 484 U.S. at 414-15). "[R]ules excluding evidence from criminal trials . . . do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." *U.S. v. Scheffer*, 523 U.S. 303, 308 (1998) (internal quotations omitted); *see also U.S. v. John*, 597 F.3d 263, 277 (5th Cir. 2010) ("[T]he accused . . . must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."). In *Nevada v. Jackson*, 133 S. Ct. 1990, 1992 (2013), the Supreme Court stated that it has rarely "held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence."

Here, the trial judge undoubtedly determined that the evidence Petitioner sought to admit was irrelevant. In Louisiana, "Evidence which is not relevant is not admissible." LA. CODE EVID. ANN. art. 402. Petitioner fails to argue that Article 402—or any Louisiana evidentiary rule for that matter—is arbitrary or disproportionate to the purpose it serves. If Petitioner wishes to

---

[16] That said, Petitioner was still able to elicit testimony from witness John Gallagher to the effect that Petitioner was still identified as the mayor of Waterproof, Louisiana on the Secretary of State's website.

succeed here by challenging the trial judge's application of Article 402, he would first have to demonstrate that the trial judge's ruling was erroneous and would then have to show that the ruling rendered his trial fundamentally unfair.  *See Johnson v. Puckett*, 176 F.3d 809, 820 (5th Cir. 1999).

With that said, Petitioner fails to show that the judge's ruling was erroneous, especially considering the fact that "the Constitution leaves to [trial] judges . . . 'wide latitude' to exclude evidence that is . . . 'only marginally relevant' . . . . *See Crane v. Kentucky*, 476 U.S. 683, 689 (1986) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).  Even assuming that the trial judge's ruling was erroneous, Petitioner has also failed to show that the ruling rendered his trial fundamentally unfair.  Accordingly, Petitioner has failed to articulate a cognizable constitutional violation resulting from his inability to present the evidence at issue.  Petitioner's Claim should be **DENIED**.

K. <u>Claim Eleven: Denial of Petitioner's Request to Call a Witness</u>

Petitioner claims that the trial court erred by releasing Elizabeth Cooper, a member of the Board of Aldermen when Petitioner was mayor, from the rule of sequestration at the end of her testimony during the State's case and then by refusing to permit him to recall her during his case-in-chief.  [doc. # 1-2, p. 57].

At trial, during the State's case-in-chief, Cooper testified on direct examination that Petitioner informed her that he was drawing a thirty-six thousand dollar salary.  *Id.* at 2234.  Yet, Cooper testified that the Board never approved such a salary.  *Id.* at 2235.  Cooper also stated that Petitioner used public funds to make personal expenditures, including trips to California, Denver, and Washington.  *Id.* at 2236.  Petitioner then cross-examined Cooper at length.

In reviewing this Claim, the Second Circuit ruled:

A trial court's exclusion of a witness due[] to a sequestration violation may be an error that prejudices the defendant and requires reversal. In this case, the trial court excused the witness and did not allow defendant to elicit testimony from her because "the Court excused her from the rule and her being in the courtroom during the testimony of the other witnesses." According to the court in *State v. Lucas, supra*, a mere violation of the rule may not be enough without an accompanying showing of prejudice.

However, in this case, the difficulty with reviewing this assignment of error on appeal is that we do not know what the witness would have said had she been allowed to testify. For purposes of appellate review, a party may make a proffer of evidence, including testimony, that the trial court has excluded. Without such a proffer to preserve the witness's testimony for review, it is exceedingly difficult for this court to determine whether defendant was prejudiced by the trial court's action.

Because the record is inadequate to address this assignment, we hold that the record, as it stands, reveals no prejudice to defendant.

*Higginbotham*, 122 So. 3d at 29-30 (internal citations omitted).

All criminal defendants have a constitutional right to compulsory process under the Sixth Amendment. *U.S. v. Valenzuela–Bernal*, 458 U.S. 858, 867 (1982). Just as an accused has the right to confront the State's witnesses, he also has the right to present his own witnesses. This right is a fundamental element of due process of law. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). However, this right is not absolute. A violation of a defendant's Sixth Amendment right occurs only if the witness would have provided evidence that is material and favorable to the defense. *See Valenzuela–Bemal*, 458 U.S. at 867.

Here, Petitioner cannot establish a violation of the right to compulsory process because Petitioner fails to show—through affidavit or otherwise—that Cooper's testimony would have been both material and favorable to his defense. In fact, it is highly unlikely that Cooper would have testified favorably to Petitioner's defense had Petitioner been able to call her, given her

adverse testimony during the State's case-in-chief.  In sum, Petitioner has not shown that the state courts' rejection of this Claim was contrary to, or an unreasonable application of, Supreme Court precedent.  Petitioner's Claim should be **DENIED**.

L. <u>Claim Twelve: Denial of Mistrial</u>

     Petitioner claims that his Equal Protection rights were violated when the prosecutor amended the indictment after the jury had been sworn in.  [doc. # 1-2, p. 60].  As a result, Petitioner argues that the trial court should have granted a mistrial.  *Id.*

     To the extent that Petitioner contends that the trial court erred in applying state laws concerning the denial of a mistrial, such a contention is not cognizable here.  As noted above, "'[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'"  *Trevino v. Johnson*, 168 F.3d 173, 184 (5th Cir. 1999) (quoting *Estelle*, 502 U.S. at 67-68).  With respect to his alleged equal protection claim, Petitioner has failed to argue or explain how the trial court's denial implicated his rights to equal protection.  Accordingly, Petitioner's Claim should be **DENIED**.

M. <u>Claim Thirteen: Jury Instruction</u>

     Petitioner claims that "the trial court committed reversible error when it denied [his] request to instruct the jury as to the proper legal standard for evaluating circumstantial evidence, over objection."  [doc. # 1-2, p. 61].  The Second Circuit set forth relevant background, as well as its ruling, as follows:

> During discussion of the charge to the jury, the district court chose to exclude the proposed instruction, which read:

> You cannot find defendant guilty solely on circumstantial evidence unless the facts proven by the evidence exclude every reasonable hypothesis of innocence.

The court explained that the charge was being removed because "this is not, in my view, a circumstantial evidence only case." Defendant objected to the exclusion of that charge.

The jury charge actually given stated:

> Evidence is either direct or circumstantial. Direct evidence is evidence which, if believed, proves a fact. Circumstantial evidence or indirect evidence is evidence which, if believed, proves a fact and from that fact you may logically and reasonably conclude that another fact exists.

> \* \* \*

> In this case, as the trial court recognized, the evidence against defendant consisted of both direct and circumstantial evidence. The state proved by direct evidence and beyond a reasonable doubt that the Mayor's salary was never legally raised to the level of the salary he paid himself and that the Mayor took in excess of $500 of Town funds for personal purposes. Accordingly, the requested charge—while an accurate statement of the law-had essentially no application to the facts as presented through the evidence adduced because this was not a "solely" circumstantial evidence case. The trial court did not err in refusing the requested charge, so this assignment of error is without merit.

*Higginbotham*, 122 So. 3d at 30-31.

It is well-settled that improper jury instructions in state criminal trials do not generally provide a basis for federal *habeas* relief.  *Estelle,* 502 U.S. at 71-72.  In order for a jury instruction by a state court to warrant federal *habeas* relief, the petitioner must show not only that the instruction given was erroneous, but also that it resulted in prejudice of a magnitude so severe that his due process right was violated.  *Cupp v. Naughten*, 414 U.S. 141 (1973); *Sullivan v. Blackburn*, 804 F.2d 885 (5th Cir. 1986).

The instruction here was not erroneous.  In Louisiana, "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypotheses of innocence."  LA. REV. STAT. ANN. § 15:438.[17]  In *State v. Johnson*, 438 So. 2d 1091, 1103 (La. 1983), the Louisiana Supreme Court held that Section 438 only applies where "an essential element of the crime is not proven by direct evidence . . . ."  In other words, Section 438 only applies when a conviction is based solely on circumstantial evidence.  *State v. Finley*, 341 So. 2d 381, 384 (La. 1976).

Here, the State offered direct evidence to prove every essential element of the crime charged.  [*See* doc. # 11, Vol. 1, p. 20A].  Thus, Section 438's language is not applicable and the trial court did not err in declining to include it in the jury instruction.  That notwithstanding, and even supposing the trial court did err in so instructing the jury, the Court does not find that the error resulted in prejudice so severe that Petitioner's due process right was violated.  Accordingly, Petitioner's claim is without merit and should be **DENIED**.

N. Claim Fourteen: Jury Polling Slips

Petitioner claims that his "right to a fair trial was fatally impaired when the judge caused prejudicial polling slips, providing for only a guilty verdict, to be delivered to the jury prior to their announcement of a verdict."  [doc. # 1-2, p. 63].  According to Petitioner, "The wording and design of the slips were a clear signal to the jurors as to what the court believed the correct and inevitable verdict to be."  *Id.*

---

[17] "Generally, direct evidence consists of testimony from a witness who actually saw or heard an occurrence, proof of the existence of which is at issue; whereas, circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience."  *State v. Johnson*, 438 So. 2d 1091, 1103 (La. 1983).

On March 24, 2011, the Sixth Judicial District Court held a hearing on Petitioner's Motion for New Trial with regard to this issue.  [doc. # 11, Vol. 11, p. 1].  At the hearing, the presiding judge at Petitioner's trial, Judge Crigler, testified that polling slips reading only "guilty" were delivered to the jury in the jury room.  *Id.* at 19.  In a letter sent to all counsel prior to the hearing, Judge Crigler wrote that the slips "were retrieved almost immediately when the error was realized, but the jurors did receive, look at, and sign the slips before the slips were retrieved."  *Id.*  However, he also wrote that the slips were delivered "fifteen minutes after the jury indicated that it had reached a verdict" and that "there was no indication that this procedure affected the verdict . . . ."  *Id.* at 20.  At the hearing, Judge Crigler testified that he was informed that the jury reached a verdict before he prepared the polling slips.  *Id.* at 20, 23.  Similarly, Cathy Foster, the bailiff at Petitioner's trial, testified that she presented the polling slips to the jury foreman only after the foreman told her that the jury had filled out the verdict form.  *Id.* at 41-42.  Leya Grover, the jury foreperson, testified that the jury reached a verdict prior to the bailiff providing the jury with the polling slips.  *Id.* at 68, 82.

After consideration, the trial court denied Petitioner's Motion and stated:

> [T]he evidence shows that the jury had deliberated, had completed its deliberations, and the verdict form had been signed by the foreperson prior to the bailiff being advised that they were ready to deliver their verdict in open court.  The polling slips were delivered to the jurors in the jury room by mistake.  It was nothing but a mistake.  I see nothing in the evidence today to show that it was something that was done to influence the jurors or that was done on purpose or purposely violated the statute.  So, getting to the issue of whether or not the delivery of those polling slips and the way they were done, whether or not that influenced the jury, the evidence is that absolutely not. The jury had decided prior to those polling slips ever being delivered to them.

*Id.* at 105.  The Second Circuit likewise denied Petitioner's claim.  *Higginbotham*, 122 So. 3d at 31.

The Sixth Amendment forbids a jury from being exposed to external influences during deliberation.  *Parker v. Gladden*, 385 U.S. 363, 364-65 (1966).  In *Remmer v. U.S.*, 347 U.S. 227, 229 (1954), the Supreme Court held:

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

Even where an intrusion is presumed prejudicial, the ultimate inquiry is whether the jury instruction affected "the jury's deliberations and thereby its verdict."  *U.S. v. Olano*, 507 U.S. 725, 739 (1993).

Here, even applying an initial presumption of prejudice, the Court nevertheless finds that the intrusion did not affect the jury's deliberations.  The intrusion did not affect the deliberations because, as the trial court found based on the testimony above, the jury rendered its verdict prior to the intrusion.  Petitioner has failed to overcome the presumption of correctness accorded to the trial court's finding that the polling slips did not prejudice the deliberations.  He has also failed to show that the appellate court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court.  Accordingly, Petitioner's Claim does not warrant relief and should be **DENIED**.

O. <u>Claim Fifteen: Exculpatory Evidence</u>

44

Petitioner claims that the State withheld exculpatory evidence from him in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  [doc. # 1-2, p. 65].  A *Brady* prosecutorial misconduct claim contains three components: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

The Second Circuit construed and analyzed Petitioner's Claim thusly:

[D]efendant's argument in brief concerns the alleged failure of the Board of Aldermen to approve, by ordinance, their own salary increase from $250 to $500, and his allegation that these board members were thus guilty of felony theft. Defendant alleges that the state had in its possession, but refused to provide to him, a recording of a June 2007 board meeting containing "the proof of all salary increases."

As the state noted in its May 14, 2010, response to defendant's several belated discovery motions:

Upon information and belief, the State shows that there is no exculpatory information in this case. However, the State has provided copies of the cassette tapes which were seized from the Town of Waterproof to defendant. The micro-cassette tapes were copied to CD–Roms with all information provided on the micro-cassette tapes copied to the CD–Roms. The data is all there and it is certainly not useless.

The state goes on to inform the court that it is recopying the microcassette tapes to other microcassette tapes, and recopying the identifying markings on the tapes and boxes, to provide to defendant.

The record does not reflect proof that the state withheld any information from defendant, and certainly there is nothing to indicate that the state withheld exculpatory information. This assignment of error is without merit.

*Higginbotham*, 122 So. 3d at 32.

Here, Petitioner has not provided the Court with any reason to believe that the State withheld any information.  As stated above, the State averred that it provided Petitioner with

copies of the cassette tapes that Petitioner alleges the State withheld.  Petitioner has not provided

any evidence to the contrary.  Even if the State did withhold information, Petitioner has failed to

demonstrate that the allegedly withheld evidence was either exculpatory or impeaching.  The

Second Circuit's rejection of Petitioner's Claim was not unreasonable; therefore, it is

recommended that Petitioner's Claim be **DENIED**.

P. Claim Sixteen: Peremptory Strikes

Petitioner claims that the trial court erroneously rejected his attempts to exercise his full

complement of peremptory strikes.  [doc. # 1-2, p. 66].  Specifically, he argues that the trial court

denied him his sixth and final peremptory strike when he attempted to strike Juror Harry

Goldman.  *Id.*

Petitioner does not challenge the impartiality of the jury; rather, Petitioner only objects to

the number of peremptory challenges that he was afforded.  In that respect, even if Petitioner was

denied a "full complement" of peremptory challenges, Petitioner's claim is unreviewable because

it raises only a question of state law . . . as opposed to one of constitutional dimension.  *See Ross*

*v. Oklahoma*, 487 U.S. 81, 88-89 (1988) ("Because peremptory challenges are a creature of

statute and are not required by the Constitution, it is for the State to determine the number of

peremptory challenges allowed and to define their purpose and the manner of their exercise.");

*Georgia v. McCollum*, 505 U.S. 42, 57 (1992) ("[T]he right to a peremptory challenge may be

withheld altogether without impairing the constitutional guarantee of an impartial jury and a fair

trial.").  Accordingly, Petitioner's Claim should be **DENIED**.

Q. Claim Seventeen: Recusal of District Attorney

Petitioner claims that the trial court erred when it denied his Motion to Recuse the district attorney.  [doc. # 1-2, p. 68].  Petitioner's Motion alleged that District Attorney James Paxton had a disqualifying conflict of interest because he represented the Town of Waterproof as the Town's attorney at the beginning of defendant's mayoral tenure and because he previously represented a client with financial interests adverse to Petitioner.  *Id.*

Aside from casually mentioning equal protection, Petitioner argues only that the trial court's denial violated state law.  *Id.*  To that extent, errors of state law do not furnish a basis for federal *habeas corpus* relief.  As to the federal implications of his claim, Petitioner has not cited, and the Court has not located, any clearly established Supreme Court precedent stating that a defendant's constitutional rights are compromised when a prosecutor who previously represented a municipality prosecutes a defendant who previously worked for that municipality in his individual capacity.  In the same way, Petitioner has not cited, and the Court has not located, any Supreme Court precedent stating that a defendant's constitutional rights are compromised when a prosecutor who previously represented a client with interests adverse to a defendant subsequently prosecutes that defendant.

To be sure, a defendant is entitled to a fundamentally fair trial, *Riggins v. Nevada*, 504 U.S. 127, 149 (1992), and the Supreme Court has suggested that a conflict between a prosecutor and a defendant could be so great as to implicate that fundamental entitlement.  *See, e.g., Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249-50 (1980) (stating that a prosecutor's personal interest in a case could raise constitutional questions but declining to define the limits "there may be on a financial or personal interest of one who performs a prosecutorial function").  Although largely inapplicable here, the Supreme Court has also held that the appointment of a prosecutor

47

whose client has a financial interest in the underlying litigation is improper.[18]  *Young v. U.S. ex. rel. Vuitton et Fils, SA.,* 481 U.S. 787, 790 (1987).  Here, considering *Young,* Petitioner has failed to show that an actual conflict of interest existed. The district attorney did not represent Petitioner in the instant criminal case and did not represent any individual or entity that stood to profit from Petitioner's conviction.  In addition, considering *Riggins,* Petitioner has failed to identify any specific facts indicating that he was denied a full and fair hearing on the merits.

Finally, as to his equal protection claim, Petitioner has failed to elaborate on how the trial court's denial implicated his rights to equal protection.  Accordingly, Petitioner fails to show that the Second Circuit's denial of this Claim was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.  Petitioner's Claim should be **DENIED**.

**Conclusion**

For the reasons stated above, **IT IS RECOMMENDED** that the Petition for writ of *habeas corpus* filed by Petitioner Bobby D. Higginbotham, [doc. # 1], be **DENIED and DISMISSED WITH PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by this Recommendation have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy of any objections or

---

[18] *Young* is inapplicable because it involved a criminal contempt proceeding in the federal courts that was disposed of not on constitutional grounds, but on the Supreme Court's use of its supervisory power.  Specifically, the *Young* Court stated: "we rely on our supervisory authority to avoid the necessity of reaching any constitutional issues."  *Young*, 481 U.S. at n.21.

response to the District Judge at the time of filing. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

Pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, this Court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. Unless a Circuit Justice or District Judge issues a certificate of appealability, an appeal may not be taken to the court of appeals. **Within fourteen (14) days from service of this Report and Recommendation, the parties may file a memorandum setting forth arguments on whether a certificate of appealability should issue.** *See* 28 U.S.C. § 2253(c)(2). **A courtesy copy of the memorandum shall be provided to the District Judge at the time of filing.**

In Chambers, Monroe, Louisiana, this 13th day of March, 2014.

_____
KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE